# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                          CASE NO: 6:19-cr-1-Orl-40LRH

RONALD HILL
_____/

## ORDER

This cause is before the Court on Defendant Ronald Hill's Motion to Suppress Statements (Doc. 28), and Motion to Suppress Evidence (Doc. 35). The Government has submitted Responses in Opposition to the Defendant's motions. (Docs. 34, 42). Upon due consideration, and with the benefit of an evidentiary hearing held on July 2, 2019, Defendant's Motions to Suppress are Denied.

### I.     BACKGROUND

On November 12, 2018, the Federal Bureau of Investigation ("FBI") used a peer-to-peer file-sharing program to download images and videos of child pornography from a computer using an IP address belonging to the Defendant. (Doc. 1, ¶¶ 4–5). On December 4, 2018, FBI Special Agent ("SA") Kevin Kaufman submitted an application and an affidavit in support of a search warrant to Magistrate Judge Spaulding. (Doc. 42-1, pp. 9–37). That same day, Magistrate Judge Spaulding issued a Search and Seizure Warrant. (*Id.* at p. 2). The FBI, accompanied by local law enforcement, executed the search warrant on December 6, 2018. (Doc. 1, ¶ 10). The Defendant moves to suppress incriminating statements made to SA Kaufman and SA Rod Hyre and incriminating evidence recovered from his computer.

## II. MOTION TO SUPPRESS STATEMENTS

Defendant Hill argues that his statements to the FBI should be suppressed because he was subjected to custodial questioning without the advisement of *Miranda* warnings, and his statements were not voluntary. (Doc. 28, p. 4). The Government characterizes the interview as non-custodial and voluntary. (Doc. 34, p. 7).

A suspect is entitled to *Miranda* warnings when interrogated while in custody because such circumstances are presumed to exert pressure on the suspect to speak. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[1] *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). That is, to find the questioning to have occurred in a custodial setting, the Court must find that a reasonable person in Mr. Hill's position would feel both "constrained not to leave" and that his "freedom of actions [was] curtailed *to a degree associated with formal arrest.*" *United States v. Luna-Encinas,* 603 F.3d 876, 881 (11th Cir. 2010) (emphasis in original). The test employed by the Court is objective; the subjective beliefs of either the defendant or the interviewing officer on whether the defendant is free to leave or is under arrest are irrelevant. *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). The only relevant inquiry is how a reasonable person in the defendant's position would have understood the situation. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Courts must examine all of the circumstances surrounding the interrogation, and no particular fact in the analysis is dispositive. *United*

---

[1] The reasonable person standard consists of a reasonable innocent person. *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).

*States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006). However, the Court should consider the defendant's age, education, intelligence, the duration and nature of the detention and questioning, and the lack of any advice to the accused of his constitutional rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Other factors for the Court to consider include whether the defendant is told he is not under arrest and is free to leave. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). In *Brown*, the Eleventh Circuit held:

> Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are "so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview."

*Id.* (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)).

Similarly, Courts are "much less likely to find the circumstances custodial when the interrogation occurs in a familiar or at least neutral surroundings, such as the suspect's home." *Id.* The Eleventh Circuit in *Luna-Encinas* further instruct trial courts to consider whether officers brandished weapons, touched the suspect, or used language or tone that indicate compliance with the offier's directives could be compelled, as well as the duration of the detention. *Luna-Encinas*, 603 F.3d at 882.

1. The Interview

In the instant case, the officers approached Defendant's home and knocked on his door in a customary manner, as opposed to banging on the door.[2] SA Kaufman

---

[2] The Government introduced the body camera records depicting the FBI's approach to Defendant's home, their initial contact with him, and the subsequent interview. (Exhibit 2.) Transcriptions of the two video/audio records were introduced as Exhibits 2(a) and 2(b). The Court viewed the video records several times before the hearing.

announced in a conversational tone "Police, Come to the door. Police. Come to the door." (Ex. 2(a), p. 1, line 13 "1:13").[3] Upon opening the door, SA Kaufman said, "Hi. You Ronald?" (*Id.* at 1:15). After confirming Mr. Hill's identity and inquiring whether any other people or weapons were in the home, SA Hyre introduced himself. (*Id.* at 2:2). SA Kaufman advised Hill they had a search warrant and asked Hill to identify his wireless provider and whether his router was password-protected. (*Id.* at 2:11–14). Mr. Hill was asked several questions about his internet provider, which information was already known from the investigation, and asked Mr. Hill how many computers or other devices he had in the home. (*Id.* at 2:19–3:14). Then SA Hyre stated:

> Okay. Hey, Ron, first thing to understand is you're not under arrest. Okay? Nothing like that. Okay? We're just – we'd like to – and you don't have to talk to us be we'd like to ask you some questions. Okay? Obviously we're – we're – we've got the warrant and so we'd just like to ask you some questions.

(*Id.* at 3:17-21).

Mr. Hill responded, "Yeah, Okay." (*Id.* at 3:25). SA Hyre asked Mr. Hill, "You understand that?", and Hill replied "Yeah." (*Id.* at 4:1–2).

Both SA Kaufman and Hyre were dressed in civilian clothing, but their body armor and side arms were visible and remained holstered. (Ex. 2). A third uniformed officer stood off to the side with his weapon secured. (*Id.*). Other local law enforcement were staged to the side and came around the corner to enter the home as SA Kaufman spoke with Defendant. (*Id.*). One female officer drew her weapon from its holster immediately before entering the home, keeping the weapon close to her side and pointed down. (*Id.*).

---

[3] References to pages and lines within the transcripts are designated consistent with the format employed in the designation of deposition testimony.

SA Hyre and Kaufman advised Mr. Hill that as soon as the officers clear his home they will go inside to retrieve a shirt for him. (Ex. 2(a), at 4:3–8). The conversation turned to whether Mr. Hill lived alone and had recently obtained his HVAC degree. (*Id.* at 5:4–17). An unidentified officer asked SA Kaufman, SA Hyre, and Defendant if they want to come inside, and SA Kaufman, SA Hyre and Mr. Hill sat at the kitchen table. (*Id.* at 6-12).[4] After taking their seats at the kitchen table, SA Hyre removed his body armor, and a female agent asked "Any other tools?", (*Id.* at 7:2), and Mr. Hill held his hands up briefly. (Ex. 2). Mr. Hill testified at the evidentiary hearing and described this gesture as his attempt to show the officers he was being cooperative and that they could search him or do anything they want. Mr. Hill was not required to raise his hands in response to the agent's comment.

Shortly after being seated at the kitchen table, SA Kaufman told Mr. Hill "the reason why we're here is because there is a peer-to-peer file-sharing program that you were using that ended up distributing child pornography to us." (Ex. 2(a), at 8:23–25). SA Kaufman's tone in making this statement was conversational and polite. Mr. Hill denied being a "hands-on offender" and readily admitted to watching child pornography "[o]nce every couple of, I don't know, months, maybe." (*Id.* at 9:10–11; 20–25; 10:1). Mr. Hill admitted to viewing child pornography starting a couple years earlier while he was in his 40s. (*Id.* at 11:13-23). Mr. Hill provided his password to the officers, so they could access his computer, admitted to downloading a video file called "Baby J", and discussed a past allegation of sexual abuse against him. (*Id.* at 12:9–14; 13:6–9; 14:23–16:16).

---

[4] A firearm was recovered from the residence, and Mr. Hill admitted during the evidentiary hearing that he told the officer the location of the weapon.

5

After discussing his typical procedure of downloading, viewing, and deleting child pornography, Defendant asked SA Kaufman "Am I going to jail?" (*Id.* at 19:5). SA Kaufman replied:

> Um, right now, like I said, you're not under arrest. It's – it – we're going to do the search warrant and see what – see what's out there. Don't know if you're gonna be arrested today or not. It depends on what's found on your computers . . . .

(*Id.* at 19:6-9)

SA Kaufman asked Defendant "Do you have any questions of us?", and Mr. Hill replied: "No." (*Id.* at 25:18–19). The interview lasted less than twenty-four minutes.

After the computer was examined, SA Kaufman told Mr. Hill:

> Hey, Ron, what we're gonna do is you – you still know you're not under arrest or anything. What I'm gonna do is I'm going to – the downloaded sessions that we had, um, I'm going to pull them up and say – you said you saw – and I just want to know if you – that you saw Baby J.
>
> . . .
>
> Okay? I'm going to pull up Baby J and see if, that way, we're talking about the same stuff that you were talking about. So that way there's not – I'm not mistaken saying that we're not thinking that Baby J is what you're thinking Baby J, so we're on the right page. Does that make sense?

(Ex 2(b), at 1:7–17).

The Defendant asks, "Do I have to?", and SA Kaufman replies: "You don't have to. I mean, but like I said, you're not under arrest so I – I – I'm just making sure that you know that it's not an arrest." (*Id.* at 1:20–22). The Defendant comments: "No, I mean, I don't have to watch it," and is then informed that he will be shown icons. (*Id.* at 1:23–24). Upon being show the icons on his computer, Defendant stated he cannot see anything and is given his glasses. (*Id.* 3:2-11). This interview lasted approximately four minutes.

*2. Discussion*

SA Kaufman testified at the evidentiary hearing that no officer brandished his or her weapon at the Defendant, and neither himself nor SA Hyre removed their firearm from its holster. SA Kaufman stated Defendant was not restrained during the interview and was handcuffed only when he was arrested. SA Kaufman described the tone of the interview as cooperative and testified that Defendant was allowed to use his Vape device to smoke and was permitted to use the restroom. Defendant Hill asked to use the bathroom after the second interview and was accompanied by a male officer. SA Kaufman stated that Hill was advised five or six times he was not under arrest and need not answer questions and that Hill understood he was not under arrest. Defendant Hill testified as well and agreed that SA Kaufman's testimony was accurate with one exception. SA Kaufman testified the Defendant had viewed child pornography for approximately ten years, and Mr. Hill testified that he had been viewing child pornography for only a few years.

At the time of the interview, Mr. Hill was approximately fifty years old and had recently earned his HVAC degree. Mr. Hill knew he was not under arrest and that he was not required to speak with the officers. Notwithstanding this knowledge, Mr. Hill sat at his kitchen table with SA Kaufman and SA Hyre and answered their questions. He did not ask to leave, nor was he prevented from leaving or discontinuing the conversation. Notably, the tone of the conversation was cordial, and Mr. Hill was cooperative. At the onset of the interview, SA Hyre removed his body armor in the presence of Mr. Hill. The interview occurred in Mr. Hill's home and was brief, lasting less than thirty minutes. And Mr. Hill was permitted to smoke and use the restroom. That he was accompanied is of no

7

consequence, particularly where, as here, a firearm was present in the home and had been secured.

Similar factual settings have been found to be non-custodial. In *United States v. Burk*, 737 F. App'x 963, 970–71 (11th Cir. 2018), the defendant was found not in custody where he was not restrained or confined, no abusive or threatening language was used by the police, and officers waited for the defendant to come outside of the home—rather than storming the premises—before speaking with the defendant. Similarly, in *United States v. Alvarez*, 732 F. App'x 729 (11th Cir. 2018), an interview was held non-custodial where the defendant was interviewed at her business, unrestrained and unmolested, and the police did not draw their weapons. The facts of this case are especially close to the non-custodial interview in *United States v. Emanuel*, 440 F. App'x 881 (11th Cir. 2018), where the defendant was interviewed at home, was not prevented from leaving, did not ask to leave, and cooperated in answering questions.

Viewing the totality of the circumstances, a reasonable person in Defendant's situation would not have felt that he was not at liberty to terminate the interview and leave. Accordingly, the interviewing officials were not required to advise Mr. Hill of his *Miranda* rights, and their conduct in conducting the interview did not render Mr. Hill's statements involuntary. Accordingly, Defendant's motion to suppress his statements is denied.

## III. MOTION TO SUPPRESS PHYSICAL EVIDENCE

Defendant Hill argues that the warrant issued by the Magistrate Judge "authorized the search of the defendant's home, and seizure of his computers and electronic devices, but did not authorize the subsequent search of those devices." (Doc. 35, p. 1). Defendant contends that the warrant on its face limited the scope of the search to the Defendant's

home, described with particularity in Attachment A to the application. (*Id.* at p. 2). Moreover, the finding of probable cause is limited to Attachment A, the residence. (*Id.*). In the absence of Mr. Hill's consent to search his electronic equipment, the defense argues the evidence obtained from those devices must be suppressed. (*Id.*).

The Government counters that the search warrant does not lack particularity, because Attachment B clearly authorizes the agents to search for and seize various categories of evidence pertaining to violations of 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B), including:

> i. Electronically stored communications or messages reflecting computer on-line chat sessions or e-mail messages with, or about, a minor that are sexually explicit in nature, as defined in 18 U.S.C. § 2256.
>
> j. Any documents, records, programs, or applications that identify the residents of the PREMISES.
>
> . . .
>
> m. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER");
>
> 1. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;
>
> 2. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;
>
> 3. evidence of the lack of such malicious software;

9

    4. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    . . .

    7. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMUTER;

    . . .

    12. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search enging, and records of user-typed web addresses; and

    . . .

    As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications, files or materials created, modified or stored in any form, including by computer hard drives, external hard drives, thumb drives, cell-phones, smart phones, floppy disks, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage devices.

(Doc. 42-1).

The point being that the Magistrate Judge authorized law enforcement to search for and seize evidence which can only be accessed by powering up the Defendant's computer and examining its contents.[5]

  *1. Discussion*

Defendant does not contend the affidavit in support of the application for issuance of a search warrant fails to articulate probable cause to search his electronic devices,

---

[5] E-mail, browsing history, bookmarks, favorites, cookies, caches, user-typed web addresses, malware, programs, and applications can only be searched for by turning on the computer and examining its contents.

including his computer. Rather, he claims that notwithstanding ample probable cause demonstrated by SA Kaufman, the Magistrate Judge narrowed the scope of the search to the premises and not the contents of the computer or other electronic devices found within that residence. At oral argument, defense counsel posited that the Magistrate Judge limited the scope of the search to the premises—and not the electronic devices discussed in detail in the affidavit and in Attachment B—because the Magistrate Judge failed to list computers and other electronic devices in Attachment A. Such a narrow construction of the search warrant would require the Court to ignore Attachment B wherein the Magistrate Judge specified with great particularity the types of electronic data, discoverable only by a forensic examination of the computer, that is subject to seizure. Had the Magistrate Judge intended to limit the scope of the search to the residence, those portions of Attachment B quoted above would be surplusage. Defendant's construction would be credible had the Magistrate Judge deleted or stuck through the portions of Attachment B that envision searching the computer, but that is not the case.

The Supreme Court in *Groh v. Ramirez*, 540 U.S. 551 (2004), held the Fourth Amendment by its terms requires particularity in the warrant. *Id.* at 557 (citation omitted). The particularity requirement is not satisfied by the fact that the application adequately describes the "things to be seized." *Id.* That is, unless the warrant incorporates the application by reference and unless the application accompanies the warrant, the application may not be considered when the warrant is examined for compliance with the Fourth Amendment. *Id.* at 557–58.

The warrant in *Groh* was deficient because, in the space set aside for a description of the evidence to be seized, the warrant did not list a single item.[6] *Id.* at 558. The contrary is true here. In the space set aside to describe the property to be seized, the warrant states "See Attachment B." (Doc. 42-1, p. 2). In Attachment B, the Magistrate Judge lists in considerable detail the evidentiary items which may be searched for and seized which can only be searched and seized through a forensic examination of a computer. The facts of *Groh* are clearly distinguishable from the instant case.

Defendant relies heavily on *Riley v. California*, 573 U.S. 373 (2014), *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015), and *United States v. Fulton*, 2019 WL 2636819 (11th Cir. June 27, 2019). *Riley* concerned an analysis of a warrantless search incident to arrest of a cell phone to prevent the destruction of evidence. 573 U.S. at 379–80, 388. The bulk of the opinion discussed the extent to which an arrestee has a diminished expectation of privacy in his possessions and the unique nature (both quantity and type) of data stored on one's cell phone. *Id.* at 392, 395–97. The Court agrees with the premise that citizens have a heightened privacy interest in electronic devices; however, the search of Defendant's computer pursuant authorized by a warrant is much different than a warrantless search incident to arrest of a cell phone.

The Eleventh Circuit in *United States v. Sparks* dealt with "a warrantless law-enforcement search [of a cell phone] conducted after a private search," finding that such "violates the Fourth Amendment only to the extent to which it is broader than the scope of the previously occurring private search." *Sparks*, 806 F.3d at 1335. While *Sparks* is

---

[6] "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Id.* at 560 (citations omitted).

illuminating on this narrow topic, the holding is inapplicable to the instant case. The holding in *United States v. Fulton* is more pertinent, because the court there found the search of a cell phone to be unconstitutional where the warrant did not particularly describe the phone as an item to be seized. *Sparks*, 2019 WL 2636819, at *2. The court stated "[a] warrant's particularity is sufficient if 'a reasonable officer would know what items he is permitted to seize,' which does not mean all items authorized to be taken must be specifically identified." *Id.* In the instant case, Attachment B to the warrant specifically identifies Defendant Hill's computer as subject to seizure.

The Court finds the warrant issued by the Magistrate Judge sufficiently identifies Defendant's computer as subject to seizure, because it specified numerous types of data that may only be seized after a forensic examination confirms its presence on the device. The Magistrate Judge did not simply authorize the seizure of computers; rather, the Court authorized the seizure of computers containing evidence of violations of the enumerated statutes. The agents involved in the execution of the warrant had no way of knowing the computer(s) housing such evidence without first examining the contents of the device(s). Assuming *arguendo* the warrant should have listed the electronic devices, and further assuming the failure to do so renders the warrant defective, the law enforcement officers who relied upon the hypothetically defective warrant are entitled to the good faith exception announced in *United States v. Leon*, 468 U.S. 897 (1984). The Court rejects the argument that the Magistrate Judge intended to limit the scope of the search to the residence and withheld permission to search computers. The plain reading of the warrant, particularly Attachment B, demonstrates the incongruity of the proffered construction.

Accordingly, the Defendant's motion to suppress physical evidence is **denied**.

**IV.	CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant Hill's Motion to Suppress Statements (Doc. 28) and Motion to Suppress Physical Evidence (Doc. 35) are **DENIED**.

**DONE AND ORDERED** in Orlando, Florida, on July 6, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record